STATE ex rel. PUBLIC SERVICE COMMISSION et al. v. SOUTHERN PAC. CO. et al. (STATE TAX COMMISSION et al., Interveners).

No. 5998.   Decided April 30, 1938.   (79 P. 2d 25.)

*Joseph Chez,* Atty. Gen., and *John D. Rice,* Deputy Atty. Gen., for plaintiffs.

*Bagley, Judd, Ray & Nebeker, Van Cott, Riter & Farnsworth, Ingebretsen, Ray, Rawlins & Christensen, George H. Smith, R. B. Porter, W. Hal Farr, Dickson, Ellis, Parsons & McCrea, Fabian & Clendenin, George R. Corey, Calvin Behle, Irvine, Skeen & Thurman,* and *G. S. Anderson, Jr.,* all of Salt Lake City, *Ray E. Dillman,* of Roosevelt, *Wallace Calder,* of Vernal, and *Burton Mason,* of San Francisco, Cal., for defendants.

*Irwin Arnovitz, Ned Warnock,* and *Herbert B. Maw,* all of Salt Lake City, for interveners.

FOLLAND, Chief Justice.

This case is to test the validity of chapters 87 and 100 of Laws of Utah 1937, amending and adding certain provisions in the statutes relating to the Public Service Commission and the State Tax Commission. The pleadings are voluminous. Plaintiffs, the Public Service Commission and the individual members thereof, instituted the action by petition for a writ of mandate requiring each of the defendants, all of whom operate public utilities within the State of Utah, to file on blank forms furnished by the commission and pursuant to demand of the commission therefor, a list of all its tangible and intangible property, together with a declaration of its "true value" on or before March 10, 1938, pursuant to provisions of chapter 87, Laws of Utah 1937. Among other things plaintiffs alleged:

"That said returns under the provisions of said Chapters 87 and 100 of the Laws of Utah, 1937, are designed to aid in forming a base for the taxation of said defendants, and the refusal of said defendants to file said information as required by said law and said order of the Public Service Commission of the State of Utah will prevent the taxation of public utilities as provided for in chapter 100, Laws of Utah, 1937, and will impair the revenues of the State of Utah."

An alternative writ of mandate was thereupon issued to each of the named defendants. Shortly thereafter the State Tax Commission and individual members thereof filed a complaint in intervention praying that an order be entered requiring the defendants and each of them to file such return with the Public Service Commission as required by chapter 87 and the order made pursuant thereto by said Commission and in accordance with the alternative writ issued by this court. The State Tax Commission alleged among other things:

"Under the provisions of Section 80-5-54X, chapter 82, Laws of Utah, 1935, as amended by chapter 100, Laws of Utah, 1937, such record assessment of public utilities must be prepared and copied into the book from the records prepared by the Public Service Commission,

known as 'Record of Assessment of Utility Companies' and the State Tax Commission of Utah must accept as true the actual value of the tangible property of the utilities in Utah as shown by the Public Service Commission and the State Tax Commission must assess the properties of the defendants and other public utilities from the valuations so recorded."

"The defendants, and other utilities in the year 1934 paid taxes upon their property in the sum of $4,053,714.31, which was 23.18% of the total paid by taxpayers on their property in that year. In the year 1935, the defendants and other public utilities paid the sum of $4,032,622.44, which was 23.14% of property taxes paid by taxpayers during that year. In the year 1936, the defendants, and other public utilities paid $3,603,409.94, which was 22.96% of all property taxes paid by taxpayers during that year. That your interveners must, by the first Monday in May in each year assess all property required by law to be assessed by it. The State Tax Commission must, before the third Monday in June of each year apportion the total assessment of all property assessed by it to the several counties so that such assessment may be placed upon the books and records of the several counties.

"That no levy of tax can be intelligently made by the State Tax Commission, the several county commissions and the municipalities until all taxing units have been advised of the assessed valuation of the property in the State, counties and other taxing units. Until such assessments are made and levies set, no taxes can be collected from the defendants or other public utilities, which will seriously jeopardize the finances of the State of Utah and render impracticable the levy and assessment of all classes of property subject to taxation in the State of Utah."

Defendants in certain groupings filed answers and cross-complaints to the complaints of plaintiffs and interveners and prayed that the alternative writ of mandate be quashed and the court issue a restraining order prohibiting the members of the Tax Commission and the members of the Public Service Commission from attempting to enforce the provisions of chapters 87 and 100, Laws of Utah 1937, pending final hearing and from attempting to impose the penalties provided for in sections 76-6-23 and 76-6-25, R. S. Utah 1933; and that said chapters 87 and 100 be declared unconstitutional and void. A temporary restraining order as prayed for was thereupon issued by the court. Defendants

by their answers admitted the allegations quoted above from plaintiffs' complaint and complaint in intervention; also admitted and denied other allegations; and by way of further answer alleged:

"Chapter 87 of the Laws of Utah, 1937, was introduced in the 1937 legislature of the State of Utah as Senate Bill No. 77 by the same senator and on the same date and as a companion bill to Senate Bill No. 76, which became chapter 100, Laws of Utah, 1937. Thereafter, as companion bills, these two bills followed parallel and approximately simultaneous courses through the Senate and House of Representatives until final passage of both on March 11, 1937, and approval by the Governor of the State of Utah on March 22, 1937. As alleged in Paragraph 11 of the complaint herein, Chapters 87 and 100 of Laws of Utah, 1937, were designed to form a single and exclusive base for the taxation of the property of all public utilities within the State whose rates are based on valuation of their properties establishing as the assessed value for tax purposes of the property of each such utility the value of its property for rate purposes, regardless of whether such company in actual practice does in fact earn a fair return or any return at all on such property or suffers an actual annual net loss from its operations and regardless of whether the present market value of the property is comparable to the amount upon which said utility is entitled to earn. The two chapters were enacted separately instead of in a single statute only because of a plan which has been in use since the adoption of the Revised Statutes of Utah, 1933, whereby new legislation is adapted to the existing code numbers, thereby giving to new statutes section numbers appropriate to the numbering in the Revised Statutes.

"Article XIII, Section 2, of the Constitution of the State of Utah provides that all taxable property within the State of Utah shall be taxed in proportion to its money value, which by its own connotation and by express legislative enactments means 'full cash value,' which in turn means 'the amount at which the property would be taken in payment for a just debt due from a solvent debtor,' which in turn means 'present market value.' Present market value depends upon the present or prospective value of the use of the property. The inquiry as to the present market value of the property of a public utility is an inquiry as to what that property is worth at the time of the inquiry. The tax assessor must, within legal limits determine present market value and not what capital has been invested in the property.

"The inquiry made by a regulatory body into the value of a public utility for rate purposes is an inquiry into the present value of capi-

tal invested in property used and useful in the public service and upon which the owners of the utility are entitled to earn but are not assured a fair return.

"A public utility which operates at a net loss and without prospects of profitable operation attracts no capital and has no market value, although its value for rate purposes may be very substantial. As the net profits of the utility increase from nothing to a fair return the property becomes increasingly attractive to capital and of increasing market value and its market value tends to approximate the equivalent of the value of its property for rate purposes."

It was further alleged that most of the answering defendants had not during the past several years earned a fair return on the value of their property used and useful in rendering public service, and that the market value of such properties was less than it would be if it had earned a fair return on the value of such property; that the application of the principle of assessment involved in chapters 87 and 100, Laws of Utah 1937, would result in ununiform assessments and taxation contrary to the provisions of the Constitution of the State and result in a taking of the property of such utility without due process of law contrary to provisions in the Constitution of the United States; that the said chapters removed the function of assessment of public utilities from the State Tax Commission, in which commission that power is vested by the Constitution of the State, and placed it in the hands of the utilities themselves, subject to the power of the Public Service Commission to change such assessment. Other objections are urged in the answers and cross-complaints of defendants, but the above is sufficient for our present purpose.

Plaintiffs and plaintiffs in intervention demurred generally to the further answers and cross-complaints and moved to strike the further answers and cross-complaints. The case was submitted on the issues made by the pleadings. Chapter 87, Laws of Utah 1937, is an amendment of section 76-4-21, R. S. Utah 1933. That section before amendment was as follows:

"The commission shall have power to ascertain the value of the property of every public utility in this state, and every fact which in its judgment may or does have any bearing on such value. The commission shall have power to make revaluations from time to time, and to ascertain the value of all new construction, extensions and additions to the property of every public utility."

Section 76-4-21, as amended, is as follows:

"The commission shall have power to ascertain the value of the property of every public utility in this state and every fact which in its judgment may or does have any bearing on such value. The commission shall have power to make revaluations from time to time and to ascertain the value of new construction, extensions, and additions to the property of every public utility; provided, that the valuation of the property of all public utilities doing business within this state located in Utah as recorded in accordance with section 76-4-21X of this chapter shall be considered the actual value of the properties of said public utilities in Utah unless otherwise changed after hearings by order of the commission. In case the commission changes the valuation of the properties of any public utility said new valuations found by the commission shall be the valuations of said public utility for all purposes provided in this chapter."

Chapter 87, Laws of Utah 1937, also adds a new section known as section 76-4-21X, as follows:

"The public service commission must on or before the first day of December of each year furnish every public utility doing business in the state of Utah whose rates are based on the valuation of its properties or the amount of its investments with blank forms providing spaces for statements of the valuation of all of the properties of the public utilities located within this state. Said blank forms shall provide for whatever segregration or division of the values of said properties as the commission may require.

"Each blank form shall have affixed thereto an affidavit which must be substantially as follows:

" 'I, ——— do swear that I am ——— (position held), of the ——— (name of company), and that as such I am in a position to know the valuations of both the tangible and intangible properties of the ——— (name of company), located in the state of Utah, and that to the best of my knowledge the above figures represent the true valuations of said properties at 12:00 o'clock noon on the first day of January of the year 19——.'

"Said affidavit in addition to the above must state the principal place of business of the public utility and other information required by the commission.

"The public service commission shall require every public utility doing business within the state of Utah whose rates are based on the valuation of its properties or the amount of its investments to declare through its authorized agent on said blank forms the full value of all of the tangible and intangible properties of said utility which are located within the state of Utah, and it shall furthermore require that the valuation of the tangible properties be listed separately from the intangible properties. In making such declaration every public utility may take into consideration any increase or decrease in values of such property during the tax year last past and may raise or lower its declared true values accordingly.

"It shall furthermore require that said blank form be filed with the commission on or before a specific date each year to be determined by the commission, and shall require the affidavit of said blank form to be signed and sworn to by a duly qualified and acting officer of said public utility in the manner provided by law. The public service commission shall furthermore prepare each year a book to be called 'Record of Valuations of Utility Companies,' in which must be entered the names of every person, organization, or corporation engaged in any utility business in Utah together with the valuation of the tangible and the valuation of the intangible properties of each of said person, organization or corporation as determined and declared by the duly qualified officers of said public utilities and as declared and filed in accordance with the provisions of this section or as otherwise determined by the commission according to law. The public service commission shall accept the values filed as provided herein unless otherwise changed by the commission upon evidence taken by and filed with the commission as the true values of the tangible and the intangible properties of said public utility and said last declared values shall be the values upon which said utility might earn a fair return. Under no circumstances shall an increase in the rates of any public utility be found justified by the commission if said increase shall result in an earning by said utility of an amount greater than a fair return on the value of the properties of said public utility located in the state of Utah as shown on the forms provided herein."

Chapter 100, Laws of Utah 1937, enacts an amendment to section 80-5-54X, chapter 82, Laws of Utah 1935, which section was added after section 80-5-54, R. S. Utah 1933,

by chapter 82, Laws of Utah 1935. The new section, 80-5-54X, chapter 100, Laws of Utah 1937, is as follows:

"The state tax commission must prepare each year a book to be called 'Record Assessment of Utility Companies,' in which must be entered the names of every person, organization or corporation engaged in any utility business, the value of all the tangible and intangible properties of said persons or companies doing business within the state of Utah upon which they are entitled to earn a fair return; together with such other information as the state tax commission may determine.

"The value of the tangible properties of the public utilities within the state of Utah which are to be recorded in the book to be called 'Record Assessment of Public Utilities,' shall be determined as follows: The commission shall each year copy in said book from the last volume of the book known as 'Record of Valuation of Utility Companies,' prepared by the public service commission, the valuations of the tangible properties of every public utility doing business in this state which said properties are located within the boundaries of Utah. Said valuation so recorded in the record of valuations of utility companies and copied by the commission in the book known as 'Record of Assessments of Utility Companies,' shall be accepted as the true and actual value of the tangible properties of said utilities in Utah, and the commission shall assess the properties of each public utility from the valuations so recorded in the same proportion to the recorded valuation as the assessed valuation of other tangible properties similarly assessed bear to their actual value. Said commission shall furthermore copy from the record of valuations of utility companies prepared by the public service commission the valuations of all intangible properties of every public utility doing business in Utah which is located within the state, and shall assess said intangible properties in the same manner as it assesses the intangible properties of the citizens of the state of Utah."

The tax law, so far as material here, prior to the 1937 amendment, provided:

"80-5-52. *Time for—Notice to Taxpayer.*

"By the first Monday in May the state tax commission shall assess, as valued on January 1, all property required by law to be assessed by it. Immediately thereafter the owner of property so assessed shall be notified of such assessment."

"80-5-53. *Taxpayers' Statements—Delict—Penalty.*

"Such officer or agent as the state tax commission may designate of every corporation, association of person owning or operating a public utility in this state, or owning or operating a pipe line, power, canal or irrigation company in more than one county in this state, shall on or before the second Monday in February in each year furnish to the state tax commission a statement signed and sworn to by such officer or agent showing in detail all property, real or personal, owned by such corporation, association or person in this state, including a statement of mileage in each county in the state, as valued at 12 o'clock m. of the 1st day of January of such year, and such other information as the state tax commission may require. The commission may for cause extend the time for filing such statement, not exceeding thirty days.

"Any person willfully failing, on demand, to furnish the statement required by this section, or any other information considered by the state tax commission necessary to enable it to determine valuations for assessment purposes or for the apportionment thereof, shall be subject to a penalty of $100 for each day of the continuance of such willful failure, which penalty shall be recovered in a proper action brought in the name of the state of Utah in any court of competent jurisdiction."

Section 80-5-54, as amended by chapter 82, Laws of Utah 1935, requires the Commission to prepare each year a book called "Record Assessment of Railroads and Other Companies," in which must be entered the assessment of each railroad and other utility, together with the amount of the apportionment to each county of the total assessment. Section 80-7-12 provides:

"If the owner of any property assessed by the state tax commission is dissatisfied with the assessment made by it, such owner may, between the third Monday in May and the second Monday in June, apply to the commission to have the same corrected in any particular, and it shall set a time for hearing such objections and may correct and increase or lower any assessment made by it, so as to equalize the same with the assessment of other property in the state."

The Legislature of 1935 made a gesture in the direction of requiring the State Tax Commission to use for tax purposes the valuation placed on property of the utilities by the Public Service Commission by enacting a new section known

as section 80-5-54X, as added by Laws 1935, c. 82. This section reads as follows:

"The state tax commission must prepare each year a book to be called 'Record Assessment of Utility Companies,' in which must be entered the names of every person, organization or corporation engaged in any utility business, or of providing and/or selling its service and/or merchandise within the state of Utah; the value of all the tangible properties of said persons or companies doing business within the state of Utah upon which they are entitled to earn a fair return as determined by the state public utilities commission; together with such other information as the state tax commission may determine. The state tax commission shall use such information and tangible property values at the time it assesses for tax purposes the tangible property of said companies and such assessments shall be in the same proportion to its true value in money as that of all other tangible property in the state of Utah."

Evidently, believing this language not sufficiently mandatory to accomplish the purposes in mind, the Legislature of 1937 enacted chapter 100, Laws of Utah 1937, amending section 80-5-54X.

Prior to the year 1930 the Legislature created a Tax Revision Commission which made a study of the conditions and laws with respect to revenue and taxation in the State of Utah. This commission drafted a number of amendments to the Constitution and recommended their adoption. Pertinent parts of the Constitution as amended November 4, 1930, follow:

Article 13, § 2: "All tangible property in the State, not exempt under the laws of the United States, or under this Constitution, shall be taxed in proportion to its value, to be ascertained as provided by law. * * *"

The quoted portion of section 2 was not new in the amendment but was in the original Constitution. Article 13, § 3:

"The Legislature shall provide by law a uniform and equal rate of assessment and taxation on all tangible property in the State, according to its value in money, and shall prescribe by law such regulations as shall secure a just valuation for taxation of such property, so that

every person and corporation shall pay a tax in proportion to the value of his, her, or its tangible property. * * *"

This section is now the same as the original constitutional provision, except in the above the word "tangible" has been added before the word "property" on the second and last lines; and the word "general" which formerly appeared before the word "law" on the third line above has been deleted from the present section.

Section 11, as amended November 4, 1930, is as follows:

"There shall be a State Tax Commission consisting of four members, not more than two of whom shall belong to the same political party. The members of the Commission shall be appointed by the Governor, by and with the consent of the Senate, for such terms of office as may be provided by law. The State Tax Commission shall administer and supervise the tax laws of the State. It shall assess mines and public utilities and adjust and equalize the valuation and assessment of property among the several counties. It shall have such other powers of original assessment as the Legislature may provide. Under such regulations in such cases and within such limitations as the Legislature may prescribe, it shall establish systems of public accounting, review proposed bond issues, revise the tax levies and budgets of local governmental units, and equalize the assessment and valuation of property within the counties. The duties imposed upon the State Board of Equalization by the Constitution and Laws of this State shall be performed by the State Tax Commission.

"In each county of this State there shall be a County Board of Equalization consisting of the Board of County Commissioners of said county. The County Boards of Equalization shall adjust and equalize the valuation and assessment of the real and personal property within their respective counties, subject to such regulation and control by the State Tax Commission as may be prescribed by law. The State Tax Commission and the County Boards of Equalization shall each have such other powers as may be prescribed by the Legislature."

This section creates the State Tax Commission in place of a State Board of Equalization, and gives the State Tax Commission enlarged powers over those of the State Board of Equalization. But this will be taken up later in this opinion.

∎

The Attorney General, representing plaintiffs, argued the case on the narrow ground that it was within legislative competence to require annual reports by owners of utilities, listing the property and valuation thereof, to be filed with the Public Service Commission for such purposes only as declared in chapter 87, without regard to the provisions of chapter 100. Under some circumstances this argument would not be without merit.

The pleadings in the case, however, require that we consider and construe the two chapters together as a unified and integral plan for the assessment and taxation of the public utilities of the State. Plaintiffs allege in their complaint that the information sought by the demanded reports is directed to aid in forming a tax base for the taxation of the properties of defendants. The allegations of the interveners clearly show the interdependence of the two chapters and that, if valid, they constitute the exclusive base for the assessment and taxation of utilities. There could be no purpose in the intervention of the State Tax Commission except as the enforcement of the requirements of chapter 87 affects its duties and powers under the provisions of chapter 100. The allegations of the complaints of plaintiffs and interveners are admitted by the defendants. By further answer of defendants they allege with particularity that the two statutes form, and are intended to form, a single plan. The demurrer of plaintiffs and interveners admits these allegations so far as they allege facts properly pleaded.

Prior to the passing of chapters 87 and 100 the Public Service Commission had plenary power to supervise and regulate every public utility in the State, section 76-4-1, R. S. 1933; to require every and any utility to furnish to the commission such information as to the property or valuation, earnings, or other matters as the commission may deem necessary, under penalty for disobedience, section 76-3-21 and section 76-3-22; and to ascertain the value of the properties of every public utility in the State and every fact which

may or does have any bearing on such value, section 76-4-21. The only new matter in chapter 87, therefore, is the requirement of annual reports in the form and manner specifically designated, together with the following:

"Under no circumstances shall an increase in the rates of any public utility be found justified by the commission if said increase shall result in an earning by said utility of an amount greater than a fair return on the value of the properties of said public utility located in the state of Utah as shown on the forms provided herein."

If the last quoted portion is given a strict construction, then the utility would be deprived of its right to earn a fair or any return on property used and useful to serve the public of Utah if such property is located outside of the state. Counsel for interveners says in his reply brief:

"A proper exercise of discretionary judgment on the part of the Public Service Commission would permit them to include the valuations of properties located out of Utah but used or useful in rendering service in the State in the rate base assessment."

This, of course, would be possible but for the language of this specific and mandatory provision, the effect of which would be to limit or control the discretion otherwise vested in the commission.

That the purpose of the amendment is principally if not wholly to have the Public Service Commission fix the valuation for tax purposes is indicated by the requirement for a return that is not limited to the valuation of property used and useful in the public service. It is only such property that may be considered for the purposes of approving rates or determining the fair return on fair value. Certainly a utility having property beyond the State which is used and useful in serving the public within the State cannot be deprived of the right to have such property considered by the commission in the matter of fixing rates. Property within the State which is not used or useful in the service of the public is subject to taxation, but no useful

purpose is served by including it in the utility's return for rate purposes.

The two chapters were introduced by the same Senator at the same time, and they went through both Houses of the Legislature and to the Governor, where they were signed by him as companion measures. An analysis of the two chapters demonstrates that they were intended to form a single and integral plan for taxation of public utilities. It is provided that the valuation prepared by the Public Service Commission "shall be accepted [by the State Tax Commission] as the true and actual value of the tangible properties of said utilities in Utah." When two separate acts of the Legislature, dealing with the same general subject, are passed concurrently through both Houses of the Legislature and signed by the Governor the same day, they should be considered together and construed as parts of the same act. *People ex rel. Reynolds* v. *Chicago, B. & Q. R. Co.*, 295 Ill. 191, 129 N. E. 168; *Schaff* v. *Rea*, 103 Okl. 62, 229 P. 472; *Oneida County* v. *Evans*, 25 Idaho 456, 138 P. 337; *Garrett Transfer & Storage Co.* v. *Pfost*, 54 Idaho 576, 33 P. 2d 743; *Blackwell* v. *First National Bank*, 10 N. M. 555, 63 P. 43. We shall therefore regard the two chapters as a single and undivided plan for the fixing of a valuation on utility property by the Public Service Commission for the double purpose.

Two questions press for solution ahead of others raised in the briefs: (1) Has the Legislature directed an assessment for taxation upon a basis other than the value of the utility property in money as required by section 3 of article 13 of the State Constitution? and (2) May the legislature itself make the valuation of utilities or vest the power of making such valuation in any officer or commission other than the State Tax Commission?

The problems of determining the fair value of utility property as a rate base and that of arriving at its value in money for taxation purposes are extremely complex and have given the courts and economists no end of concern.

The Legislature has attempted by one single stroke to solve problems that have baffled the courts ever since government has been controlling rate making by public utilities.

Prior to the enactment of the challenged amendments, the Public Service Commission had plenary power to regulate utilities and to fix rates which should be fair and reasonable. There was no legislative requirement that the utility rates be based on the fair value of the property, but only that they be fair and reasonable. The State Tax Commission by Constitution and statute was required to assess tangible utility property at its "value in money" for taxation purposes. The courts have never held to any rigid formula or exclusive test for determining the value of utility property as a rate base, but have recognized a wide discretion in the Railroad and Public Service Commissions in the exercise of their power of determining fair and reasonable rates which should yield a fair return to the utilities and also be fair to the consumer and the public. Many of the factors to be considered in determining value are common for both purposes, but emphasis is placed at different ends of the scale. The elements usually considered are: Original or historical cost, cost of reproduction new—less depreciation, conditions of competition in the industry, efficiency or lack of it in management, bonded indebtedness, current market value of stocks and bonds, actual present earnings and earnings over a period of years.

In determining fair value for rate-making purposes the start is made with historical cost or reproduction cost new, less depreciation. *Smyth* v. *Ames,* 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819; *St. Louis & O'Fallon Railway Co.* v. *U. S.,* 279 U. S. 461, 49 S. Ct. 384, 73 L. Ed. 798; *Southwestern Bell Telephone Co.* v. *Public Service Commission,* 262 U. S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; *Railroad Commission of California* v. *Pacific Gas & Electric Co.,* 302 U. S. 388, 58 S. Ct. 334, 82 L. Ed. . . ., decided January 3, 1938. On the other hand, for taxation purposes, where it is the present value of the property in money that is

to be determined, the present, past, and prospective future capacity to earn and the market value of stocks and bonds of the utility for a reasonable period antecedent to making the assessment constitute the most reliable and influential evidence of value. *Chicago & N. W. Railroad Co.* v. *Eveland,* 8 Cir., 13 F. 2d 442; *Harris Trust & Savings Bank* v. *Earl,* 8 Cir., 26 F. 2d 617; *Cleveland C. C. & St. L. Railway Co.* v. *Backus,* 154 U. S. 439, 14 S. Ct. 1122, 38 L. Ed. 1041; *Great Northern Railway Co.* v. *Weeks,* 297 U. S. 135, 56 S. Ct. 426, 80 L. Ed. 532; *Southern Railway Co.* v. *Kentucky,* 274 U. S. 76, 47 S. Ct. 542, 71 L. Ed. 934. The fair value as a rate base and the value in money for tax purposes are not necessarily the same. There is a distinction between the two. As said in *Northern Pacific Railway Co.* v. *Adams County, D. C.,* 1 F. Supp. 163, 173:

"It is familiar learning that reproduction cost less depreciation is a very important element in ascertaining the value of corporate property for rate-making purposes. Since the decision of 1898 by the Supreme Court in *Smyth* v. *Ames,* 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819, there has been little room for doubt on that point. But is it a proper factor in determining value of corporate property for taxation purposes? It is not sound to say that a given property can have but one value, and that that value must be taken in every instance where the value of such property is involved. To reach such a conclusion is to ignore fundamental considerations. In valuing railroad property for taxation, the value of the utility is the thing sought."

Again on page 175 of 1 F. Supp. the court said:

"I shall not undertake further discussion of the cases. From the ones already noticed I feel that the true rule can be fairly extracted. Valuation for rate-making purposes and valuation for taxation purposes are not necessarily the same; the former being a basis upon which the corporation is entitled to a fair return, if it can succeed in earning it, the latter valuation being that reflected by the use of competent factors and elements reasonably calculated to disclose the actual results in fact enjoyed in the practical operation of the utility or which ought to have been obtained under competent, honest, and economical management—the one measuring what is permissible, the other what is achieved or should have been achieved."

The court observed the disparity between what railroads were allowed to earn and what they actually earned, which made valuations for rate purposes unfair for taxation. But it added (page 175):

"However that may be, considerations of public policy strongly argue for a constant endeavor to keep the two valuations close together."

In fixing rates the value of the service to the consumer, conditions of competition, if any, the ability of the proposed rates to attract and hold business, and yield a fair return on the rate base value, will all be considered. Once rates are approved the actual earning capacity of the utility under such rates is the important factor in creating a market value of the utility. The commissions, economists, and the courts have long since recognized that the market value is immediately determined by the earning power under prevailing rates.

In his book, "Effective Regulation of Public Utilities," Mr. John Bauer says (page 137):

"In rate regulation we cannot deal with the ordinary conception of value as used generally in business or by economists. It is, of course, a commonplace that in ordinary usage the value of a property is dependent upon earning power, which in turn depends upon the rates charged for service; and thus for rate making purposes would swing into a circle and get nowhere. We must have a definite physical basis of determining valuation for rate making, which must consist either of original cost of existing properties, or the reproduction cost, or some definite combination of physical cost elements, with or without deduction for depreciation. These are determinable categories and can be practically established without reference to rates. But fixing a value which is dependent upon fair rates and simultaneously measuring the fairness of the rates by the value, is obviously legal and economic legerdemain."

Frederic G. Dorety, in an article entitled "The Function of Reproduction Cost in Public Utility Valuation and Rate Making," 37 H. L. R. 173, at page 189, says:

"Under either of these processes the value of the plant would become a result of the rates rather than a basis for rates. And this is logical. Value is an economic fact not to be created, decreed, or modified by fiat of government. It can be modified by changing the rates, and the amount of value which will result from any assumed rate base can be estimated. But to attempt to decree or predetermine a value in advance of rates is to reverse the process of logic. If rates are established upon a basis of reproduction cost, value will tend to approximate such cost, but this will be through the operation of economic law and not because a certain figure has been decreed as value."

The article by Mr. Dorety is referred to and quoted by Mr. Justice Brandeis in his dissenting opinion, *St. Louis and O'Fallon Ry. Co.* v. *U. S.,* supra, to which he adds (page 394) :

"Value has been defined as the ability to command the price. Railroad property is valuable as such only if, and so far as, used. If rates are too high, the traffic will not move. Hence the value or rate base is necessarily dependent, in the first place, upon the commercial ability of the property to command the rates which will yield a return in excess of operating expenses and taxes; and such value cannot be higher than the sum on which, with the available traffic, the fair return fixed under Section 15a [49 U. S. C. A. § 15a] can be earned. Persistent depression of rates or lessening volume of traffic, from whatever cause arising, ordinarily tends to lower actual values of railroad properties."

The fixing of values on utility property is complicated further by the fact of government control and the exercise of the power to fix rates and limit the rate of return. The State may reduce rates and restrict earnings, but it does not guarantee that the utility shall earn the fair rate of return which it permits. The utility must take the risks incident to competition and economic changes.

If the utility could always earn a fair return on its determined fair value for rate purposes, no more and no less, then the value of its property for taxation purposes should be equal to or the same as its value for rate purposes. The utility cannot always earn just that. If its operation yields less than the fair return over a period of years, the market or cash value of its property necessarily declines, while, if it earns more, and the commission takes no steps to reduce

rates, the property is enhanced in value. One illustration will suffice. Reference was made in oral argument to a certain intrastate railroad which was built at a cost of approximately $6,000,000. Competition by busses and truck transportation, privately owned cars, and other factors reduced its earnings so that it went into receivership. Recently the property sold for $635,000. Clearly this utility is not now worth what it cost or its reproduction cost less depreciation. Other courts have recognized the play of economic forces in determining the market value of a utility as something different from its cost. In *Oregon-Washington R. & Nav. Co.* v. *Thurston County,* 98 Wash. 218, 167 P. 930, the court said (page 935) :

"It is, of course, a necessary rule that, in valuing a railroad, the first inquiry is as to its actual cost. That, prima facie, is its value. But if it appears that the actual cost was in excess of the necessary cost, the necessary cost is the proper standard. If it further appears that the net income of the road does not amount to current rates of interest on its necessary cost, and is not likely to do so, or if the business of the road is likely to be destroyed or impaired by competition or other cause, or if the utility of the road is not equal to its cost, then its value is less than its cost, and must be determined by reference to its utility alone. *State* v. *Central Pac. R. Co.,* 10 Nev. 47."

The allegations in the cross-complaints of defendants show that the operation of the utilities in this State during the past several years has failed to yield the permitted fair return. Therein is found at least one explanation why the value of such utilities for tax purposes would be less than their respective values as a rate base.

It would seem that the Legislature has attempted to compel the State Tax Commission to use a valuation basis for assessment of utilities which is, or may under some circumstances be, different from the value of such property in money, contrary to the requirement of the Constitution.

We have said this much relative to valuations to indicate the difficulty in establishing any dogmatic formula or

method of determining values for all purposes, however simple and fair such method or formula may appear on its face. The Legislature, however, has not by the enactment of chapters 87 and 100 prescribed any definite rule to guide the commissions in the valuations of utility property. It has merely required the utility to report its inventory of property and fixed by the Public Service Commission, whereupon it becomes the valuation for tax purposes. The Public Service Commission is left to exercise a discretion as to what criteria it will consider in determining fair value. The legislative power to "prescribe by law such regulations as shall secure a just valuation for taxation of such property" under section 3 of article 13 of the Constitution, as amended in 1930, has not been exercised to specify a definite guide in fixing values. That is to say, the Legislature has not indicated whether it shall be on the basis of any or all of the following: Historical cost, reproduction cost less depreciation, capitalization of earnings, market value of stocks and bonds, actual earnings or earning capacity. That is still left to a state agency to determine, but the agency to which it is delegated is the Public Service Commission which has power to fix values for rate purposes, and not to the Tax Commission which is vested by the Constitution with the power of assessment, adjustment, and equalization of utility properties for tax purposes. The Legislature has not thereby enacted a uniform method of assessment to the end that every person and corporation shall pay a tax in proportion to the value of his, her, or its tangible property, but it has said that a valuation for rate making purposes shall be used for taxation purposes.

It is apparent the challenged legislation has merely placed the power of valuation of utility property for tax purposes in the hands of the Public Service Commission. Has the Legislature the power to do this, in view of article 13, § 11, of the State Constitution, amended in 1930, which provides that the State Tax Commission shall assess public utilities and adjust and equalize the assessment and valuation of

property among the several counties. This is a definite delegation of power by the people through the Constitution to the State Tax Commission to assess utilities. If the assessment of utilities means the placing of a valuation on its property, then the Legislature has no power to delegate that function to any other office or commission. *State* v. *Eldredge*, 27 Utah 477, 76 P. 337. In that case this court shielded the county assessor in the exercise of the power of assessment of utilities located exclusively within county limits against an attempted shift of that power to the State Board of Equalization. The court said (page 339) :

"In determining the question here presented, we must not be unmindful of the fact that the assessment and collection of taxes, for the support of the government, are among the highest acts of supreme power. Where, therefore, the sovereignty itself prescribes a system for the assessment of property for the purposes of revenue, every branch of the government is bound by it. But in the absence of such a system in the paramount law, and of constitutional restraint, the Legislature has absolute power to adopt any means it sees fit for the purpose of assessing property to raise revenue to defray the expenses of the government. The power to tax property for governmental purposes is inherent in the state, and may be exercised by the Legislature, subject to constitutional restrictions.

\* \* \* \*

"In the light of these considerations, the conclusion is inevitable that there was no intention on the part of the framers of the Constitution by the use, in the last sentence of section 11, art. 13, of the general words, 'such other duties as may be prescribed by law,' to confer power upon the Legislature to authorize the State Board of Equalization, a state agency with power over general state affairs, to invade the province of local officers and administer local affairs by assessing, for revenue purposes, property the situs and operation of which is wholly within one county. If the construction which the relator seeks to place upon that language of the Constitution were to be adopted, then there would seem to be no reason why the State Board, by legislative enactment, might not be authorized to also levy and collect the taxes upon property situate wholly within one county, or to perform any other local duties which the Legislature might see fit to impose upon the board.

\* \* \* \*

"From the foregoing considerations it is clear that the Legislature has no power, under the Constitution, to authorize the State Board of

Equalization to assess or value property, for the purposes of taxation, the situs and operation of which are wholly within one county."

The word "assess" has a broad or narrow meaning, according to the sense or connection in which used. The narrow meaning usually is limited to the listing and valuing of property for taxation; in its broadest sense it includes the entire process of listing, valuing, levying, and extending the tax on the rolls. 61 C. J. 618.

In the Eldredge Case the court gave to the word "assess" a meaning which included the valuation of property. It said (page 340):

"And the term 'assess,' as here employed, has a comprehensive meaning. It includes the valuation of property, as well as the levying of the rate of taxation."

The court also recognized the holding of prior Utah cases that the Legislature had the power to authorize the State Board of Equalization to assess property of utilities located partly in one county and partly in another because the assessment of such property may fairly be regarded as an act of adjusting and equalizing the valuation of property between different counties of the State, as provided in the Constitution. Prior to the 1930 amendment the State Board of Equalization listed and valued the property of utilities where the situs of the property and operation of the utility was in more than one county, but where limited to one county the assessment was by the county assessor. One of the changes intended by the 1930 amendment was to place the power of assessment of all utilities in the newly created State Tax Commission which succeeded the Board of Equalization. The purpose was clearly disclosed by the Tax Revision Committee, created by the Legislature to study the entire problem of taxation in the state, in its report to Governor George H. Dern in 1929, at page 80 as follows:

"Assessments by state tax commission. At present the state board of equalization assesses mining property, except the surface value

of metal mining claims, which are assessed by the county assessor at a flat rate of $5 per acre. It also assesses public utility property which operates in more than one county of the state. We recommend that the tax commission continue this assessment of mining property and inter-county utility property. We also recommend that the tax commission be required to assess local utility property, that is, public utility property which does not now come under the jurisdiction of the state board of equalization. We believe that if all public utilities are assessed by the state tax commission the assessment of these classes of property will be more uniform than at present. As the economic development of the state continues, it may be wise to provide for the assessment of additional property by the state tax commission. We suggest, therefore, that the amendments to the constitution be so worded as to permit the assessment of other classes of property by this commission if the need arises."

The amendment, now section 11 of article 13, is substantially the same as the one proposed by the committee. The committee wording was, "It shall assess mining property and the property of public utilities, and equalize and adjust," etc. The amendment as adopted is, "It shall assess mines and public utilities and adjust and equalize," etc. The recommendation of the committee sets at rest any question respecting the intention of those responsible for the drafting of the amendment. This intention, having been conveyed to the Governor and Legislature in the official report, is evidence that the Legislature in adopting the amendment and recommending to the people its adoption intended the accomplishment of the same purpose.

The legislative use of the words "assess" and "assessment" in the statute further justifies our holding that the word "assess" as used in the Constitution included the evaluation of property. Section 80-5-52, R. S. U. 1933, is as follows:

"By the first Monday in May the state tax commission shall assess, as valued on January 1, all property required by law to be assessed by it. Immediately thereafter the owner of property so assessed shall be notified of such assessment."

The next section provides that an officer or agent, as the commission may designate, of every corporation, association, or person, owning or operating a public utility, shall before the second Monday in February furnish to the commission a statement under oath showing in detail all property real or personal owned, together with the mileage in each county, and such other information as the commission may require. To enable the commission to "determine *valuations* for *assessment* purposes or for the apportionment thereof." (Italics added.) Section 80-7-12 provides for a time when the commission may sit to hear objections to its assessments, and at such hearing "may correct and increase or lower any *assessment* made by it, so as to equalize the same with the *assessment* of other property in the state." (Italics added.) It is apparent from the use thus made of the terms that in this state the words "assess" or "assessment" have reference particularly to the placing of a valuation on property. And where the use made of the term indicates a broader meaning, it includes the act of placing a value on the property.

Counsel for the Tax Commission in his brief says:

"In Utah the Tax Commission still has discretionary power to assess as to the properties not used or useful in the public service and other properties not included in the rate base valuation of the Public Service Commission."

This language clearly concedes in the opinion of counsel that but for the adoption of chapters 87 and 100 the Tax Commission would have a discretionary power to place values on all public utility property, but that now after the passing of the amendments the discretion of evaluating utility property for tax purposes is taken from the Tax Commission and vested in the Public Service Commission, with the exception of such property owned by the utility but not valued by the Public Service Commission, and as to that the discretion still remains in the Tax Commission. If the discretion and power of the Tax Commission had been given

it by the Legislature under its plenary power over taxation, then the Legislature could withdraw part or all of the authority which it had delegated, but in this state the State Tax Commission has vested in it by the State Constitution the power to assess utilities. To the extent that such power depends on constitutional provision, the Legislature is without power to deprive the Tax Commission of any of its authority.

Counsel for the State Tax Commission argues that we should read together and harmonize section 3 and 11 of article 13 of the Constitution, amended in 1930, and that by so doing we can sustain the constitutionality of chapters 87 and 100, Laws of Utah 1937, on the theory that the State Tax Commission may exercise the power to assess until the Legislature prescribes regulations which shall control the commission's discretion in the matter. Of course the two sections must be read together and a definite meaning attached to each. The rule, however, is that, where there is a general provision and a specific one, the specific must be given full effect. 11 Am. Jur. 663. This rule of statutory construction was upheld in *Salt Lake City* v. *Salt Lake County*, 60 Utah 423, 209 P. 207, wherein it was said (page 208):

"Further, it is an elementary doctrine that, where two statutes treat of the same subject-matter, the one general and the other special in its provisions, the special provisions control the general. *State ex rel. Morck* v. *White*, 41 Utah 480, 126 P. 330; *Nelden* v. *Clark*, 20 Utah 382, 59 P. 524, 77 Am. St. Rep. 917; *University of Utah* v. *Richards*, 20 Utah 457, 59 P. 96, 77 Am. St. Rep. 928; *Crane* v. *Reeder*, 22 Mich. 322."

Constitutional provisions must be considered as limitations on legislative power where there is language of limitation or exception. Legislative power over taxation is plenary except where limitations or exceptions are expressed in the basic law. The provisions of section 11 specifically vest the power of assessing utilities in the State Tax Commission. Therefore, that specific provision must

be considered as a limitation on the power of the legislature to place the assessing power in any other officer or commission.

It is well to keep in mind that the general provisions of section 3 referring to legislative power were part of the Constitution from the beginning. When the section was amended, the portion quoted herein was merely continued as part of the section. Section 11 is new in that it creates the State Tax Commission in place of the Board of Equalization and grants new and added powers to that commission beyond the powers formerly in the Board of Equalization. Considering the two amendments together for construction, it is apparent the people intended to vest enlarged powers of assessment in the State Tax Commission and to that extent limit the general powers of the Legislature.

Counsel for interveners also argues:

"Until the Legislature exercised its right to provide by law for the method of determining the rate of assessment and taxation of tangible properties of utilities as required in section 3 of article 13, the Tax Commission, under section 11, was to exercise broad power in the assessment of utilities. After the Legislature had exercised its right, however, the meaning of the term 'assess' as it applied to the Tax Commission was to be interpreted to be the right to fix the rate and apply the tax on the valuation acquired, as provided by the Legislature in chapter 87."

This view would recognize legislative power to strip the State Tax Commission of all power of assessment, except to perform certain clerical duties. The very heart of assessment is the making of valuations. The Idaho court in *Northwest Light & Water Co.* v. *Alexander*, 29 Idaho 557, 160 P. 1106, discussed the same problem as follows (page 1111):

"It is clear to our minds that if this court should hold that the power to assess public utilities in this state is vested in the Public Utilities Commission, and the power to place a value thereon for assessment purposes is taken away from the State Board of Equalization, either in whole or in part, that board would be deprived of its

judgment and discretion in the matter of the assessment of the public utilities of this state, and, in lieu of being the board with power to assess and equalize the properties of public utilities, it would become a listing board only."

The "right to fix the rate" of levy is a power not in the Tax Commission. It may fix the rate for the State and state school tax, but subject to control by the Legislature. In any event, the rate is merely a mathematical computation when the total assessment of values and the sum to be raised, because of legislative appropriations, are known. The fixing of rates for county, school, municipal, and district purposes is for the respective local authorities and cannot be exercised by the State Tax Commission. All this was well known at the time of the adoption of the 1930 amendment, and there could have been no intention then of limiting the word "assess" to mean the fixing of the rate of levy. Nor, indeed, can it refer to the computation of the total levy on assessed valuations in order to arrive at the amount of the tax, because all that clerical work must be done by the county auditors before the assessment rolls are delivered to the county treasurers for collection.

Cases from other jurisdictions support the view here taken and as expressed in *State* v. *Eldredge,* supra, that the term "assess" as used in the Constitution includes the valuation of property, and that, where the power of assessment is by the Constitution placed in the State Tax ■ Commission, such power cannot by the Legislature be placed elsewhere. *In re Taxation of Mining Claims, In re House Bill No.* 270, 9 Colo. 635, 21 P. 476, the court said:

"The constitution does not authorize the general assembly to assess any class of property for taxation. Before taxes can be levied upon any article of property, it must be assessed; that is to say, valued for taxation. This, in general, is the province of officers whose title of office indicates their duties, to-wit, assessors. The constitution has created this office."

In *Blomquist* v. *Board of Commissioners,* 25 Idaho 284, 137 P. 174, the court said (page 176):

"Before taxes can be levied upon any property, the property must be assessed; that is, it must be listed and valued for taxation. Under our Constitution this duty devolves upon the officers whose title of office indicates that duty, to wit, the assessors. The Legislature cannot assess property, nor can any appointive board assess property, for taxation under the Constitution of the state of Idaho, and the essential duties of an assessor and a county board of equalization must be preserved until a change is made by proper amendments to the state Constitution."

In *Osage & Oklahoma Co.* v. *Millard,* 45 Okl. 334, 145 P. 797, is the following (page 798) :

"* * * that the language of the Constitution in vesting power in the state board of equalization necessarily excludes the power of the Legislature from conferring authority upon any other person or officer to assess any property belonging to such corporation; that this language is equivalent to saying that the power is vested in the state board to assess all railroad and public service corporation property; and that this power shall not be vested in or exercised by any other official."

In *State* v. *Shipman,* 290 Mo. 65, 234 S. W. 60, it was held (page 65) :

"Under a constitutional provision requiring such assessments to be made by a designated officer only, it has been held that the Legislature has no power to make assessments. * * *

"Our Constitution contemplates the determination of the value of property by officers, and not by the Legislature."

*In re Opinion of Justices,* 55 Colo. 17, 123 P. 660, the court held the Legislature could not deprive the State Board of Equalization of its power of assessment and confer such on the State Tax Commission because, where such powers are constitutionally vested, they can be taken away only by constitutional and not by statutory enactment. To similar effect is *People* v. *Pitcher,* 56 Colo. 343, 138 P. 509, 511, wherein the court adheres to the rule that, where duties have been imposed upon certain agencies by the Constitution, the Legislature "is powerless to take them away or confer them

upon another." Says 3 Cooley on Taxation, 3d. Ed., § 1002, at page 2019:

"Functions of constitutional officers, i. e., officers provided for by the Constitution, cannot be exercised or transferred by the Legislature."

We conclude therefore the Constitution has conferred on the State Tax Commission the power of assessment of utilities, which includes fixing of valuations on utility property, and that this duty and power cannot be directly exercised by the Legislature or by it conferred on any other officer or board, as attempted to be done by chapters 87 and 100, Laws of Utah 1937. The two chapters, having been enacted to serve a single purpose and each an aid to the other in effectuating that purpose, must fall together. Other questions presented need not be discussed as the above disposes of the cause.

The alternative writs of mandamus heretofore issued are recalled and peremptory writs of mandamus denied. Each party to bear its own costs.

HANSON and MOFFAT, JJ., concur.

WOLFE, Justice (concurring specially).

I think the court's opinion presents a clear and able exposition of the questions therein discussed. However, I think the occasion demands a somewhat more specific consideration of the nature of the functions remaining in the Legislature as they relate to and impinge on the power of the Tax Commission to assess utilities given in Article 13, § 3, of the Constitution, as amended in 1930. Otherwise, it may be wrongly inferred that the Legislature has no power to lay down formulae for the guidance of the Tax Commission in the exercise of its functions of assessing utilities. The opinion states:

"The legislative power to 'prescribe by law such regulations as shall secure a just valuation for taxation of such property' under section 3

of article 13 of the Constitution, as amended in 1930, has not been exercised to specify a definite guide in fixing values. That is to say, the Legislature has not indicated whether it shall be on the basis of any or all of the following: Historical cost, reproduction cost less depreciation, capitalization of earnings, market value of stocks and bonds, actual earnings or earning capacity. That is still left to a state agency to determine, but the agency to which it is delegated is the Public Service Commission which has power to fix values for rate purposes, and not to the Tax Commission which is vested by the Constitution with the power of assessment, adjustment, and equalization of utility properties for tax purposes."

Thus it appears affirmatively to recognize that the content of the word "assess" in the phrase, "It shall assess mines and public utilities," etc., as used in article 13, § 11, amended in 1930, is not such as to prevent the Legislature from providing a method or formula, which if it embraces the proper principles for arriving at "value in money," must be followed by the Tax Commission. However, where the line between constitutionality and unconstitutionality is narrow and refined, the fatalities relied on for the decision of unconstitutionality should be so particularized that the pitfalls may be avoided if and when the Legislature chooses again to follow that road toward a more equitable distribution of the heavy tax load the citizens of the State are required to bear.

I shall, therefore, endeavor to confine my remarks to a consideration of the type of formula which the Legislature may provide as binding on the Tax Commission. As a preliminary to this consideration I shall state why I think the word "assess" as used in the clause above set out, from article 13, § 11, does not have the content of meaning which gives the Tax Commission not only the power to value but also the exclusive authority of determining how and by what formulae in its discretion it will find the value. The Legislature, I think, may subject it to directions in that regard.

If the amendment of 1930 gave the Tax Commission sole authority to devise the formula to be applied, it would

enjoy a power vast in its extent, and exercisable without democratic control. The Governor appoints the Tax Commission by and with the consent of the Senate. It would have to be quite clear that the people in adopting this amendment meant to give to an appointive commission, removable only for cause, such power completely divorced from democratic control through the Legislature. Such concentration of sole powers in a small appointive body free from any control of the Legislature would be very apt to intensify the battle of conflicting interests to control the appointing power—a consequence not particularly healthy in political life.

Far from being clear that the people meant to do this, it seems to me that an interlaced reading of all the provisions of sections 3 and 11, article 13, shows just the opposite. Section 3 specifies that "The Legislature shall provide by law a uniform and equal rate of assessment and taxation on *all* tangible property in the State, according to its value in money," (Italics added)—not a law regarding some or most of the tangible property, but *all* of it. Then follows a specification that it "shall prescribe by law such regulations as shall secure a just valuation for taxation of such property, so that every person and corporation shall pay a tax in proportion to the value of his, her, or its tangible property." Were it not for section 11, there could be no doubt but that section 3 would permit the Legislature to provide regulations to govern the valuation of public utilities. It would be charged with that duty. *I think regardless of section 11 the* Legislature still has that power. I do not see that there is any real conflict between the powers given the Tax Commission under section 11 and those duties imposed on the Legislature by section 3. I do not think it is a matter of a specific provision prevailing over a general one. I think the two provisions can be and necessarily must be harmonized by a different tenet of construction. What is the interpretation which should be given to the word "assess" as contained in the phrase, "It shall assess mines and public utilities," etc., in section 11, article 13, and the meaning which

must be given to the word "assessment" in section 3 of the same article?

In the first place, it will be noted that by section 3 the Legislature is not to "assess" or "tax" all tangible property. It could not do that because it is not directly equipped to do the administrative work of assessing. It must *provide by law* a uniform and equal rate of assessment and prescribe such regulations as shall secure a just valuation. I therefore agree with the main opinion that the Legislature has no direct power to assess or determine valuations. But in providing by law for the securing of a just valuation it must set up agencies to determine that valuation. In the case of ordinary property in the counties it has designated the county assessor. It was given power expressly by the Constitution, section 5, article 13, to "vest in the corporate authorities thereof [county, city, town or other municipal corporation] respectively, the *power to assess* and collect taxes for all purposes of such corporation." (Italics added.) The Legislature made the county assessor the officer to assess property, not only for purposes of the municipal corporations, but for *state* taxation purposes as well. See section 80-5-3, R. S. U. 1933, and like sections in former compilations. It thus used the power given by section 5, article 13.

Selecting the agency to effectuate this securing of a just valuation is one of the elements necessarily contained in the power and duty to secure such just valuation. The only property for which an agency to assess cannot be selected by the Legislature is that of public utilities and mines. The people in the case of utilities and mines themselves selected the assessing or valuing agency and froze this choice by embedding it in the Constitution. Thus I agree again with that part of the main opinion which holds that the Tax Commission is the sole agency to assess utilities. But a further point which must be noted is that the selection of the agency in the Constitution to value these properties did not detract from, and is in harmony with, the power of the Legislature

to provide by law, according to section 3, regulations to secure a just valuation of utilities. The Constitution made the Tax Commission the sole agency to assess, but subject to the paramount authority of the Legislature to prescribe regulations to govern the assessment. I emphasize this point because I think implications may be taken from the main opinion, unless a very careful reading is given it, which would seem to hold that the power to assess utilities given to the Tax Commission includes every step in the whole process of assessment. That would mean that it had the sole power to fix or adopt the formula to arrive at a "value in money."

Such power to make regulations includes the power to prescribe a method or formula for finding the value, which method or formula must be subject to the outstanding requirement that it be designed to find or reasonably appropriate or suitable for finding the "value in money." Such holding does not make the Tax Commission a mere computer. In the application of almost any formula or method there is great opportunity for the use of judgment. That my thesis to the effect that the Constitution in making the Tax Commission the valuation agency for utilities did not take from the Legislature the power to prescribe the method or formula is borne out by the following observations:

Section 11 specifies that the Tax Commission "shall assess mines and public utilities." But when we further examine section 4 of that same article 13, we find it specifies, "All metalliferous mines * * * shall be assessed as the Legislature shall provide." There is a proviso which retains a certain former constitutional method of assessment until January 1, 1935, and thereafter until others *were provided by law*. Section 11 giving the Tax Commission power to assess mines and section 4 giving the Legislature power to provide for assessment of mines after January 1, 1935, can only be reconciled on the basis above suggested, to wit: That one agency may prescribe the method or formula for assessment and the other agency do the assessing. If this is the case

with mines, I think under the overarching authority of section 3 it is also true of utilities.

I have attempted at some length to place the line of separation between the powers granted to the Legislature in reference to the valuation of mines and utilities and the powers granted to the Tax Commission in regard to the same subject. I now come to the question of prescribing the principles which must govern the legislative formulation of a method for assessment of utilities. The clue is, of course, given us by the words "assessment * * * according to its value in money." The Legislature may not in prescribing a formula ignore those words. They represent the objective which any prescribed method of assessment must be designed to obtain. If the formula contained elements which could not possibly be a guide or an aid or had no relevancy to the end to be arrived at, to wit, determination of the property's value in money, the formula would be pro tanto invalid. Moreover, if it was so restricted as to exclude the consideration of those elements which were generally recognized as being required to be taken into consideration to arrive at the value in money, it would be invalid in toto. By "value in money" is meant that money which one able to pay and desiring the property but not forced to buy would be willing to pay for the property when the seller was not forced to sell. In short, into what amount of money on a free market could the property be reasonably converted. In the case of utilities which must be appraised in the end as a unit, although resort may be had to the elements composing it as an aid, the task is quite difficult. This is because there is no ready market for utility systems and few, if any, buyers. So in the case of utilities, resort to many elements may be had. As stated by the prevailing opinion, there may be considered the original cost, or historic cost, revised to determine whether it was the prudent, reasonable, or necessary cost, reproduction cost new, capitalized earnings, stocks and bonds, surveyed over periods which will eliminate the fluctuations not due to intrinsic conditions or directly to economic

outlook, but because there are temporarily many more sellers than buyers and prospective earning power. I think the last quite important. At the argument much stress was laid on capitalized present earnings as the main criterion. But, if the assessing authorities were compelled to write off of the assessment rolls or reduce it to the value of its dead physical property at the prices such property would bring during depressions, we could not run the government. Every farmer who showed a loss might claim his business was a detriment because he was forced to put money into it to preserve and maintain it, and therefore it should not be taxed or its taxes greatly reduced. But the fact is that the government is up against the simple necessity of raising sufficient money to survive and, in order to do so, it must keep up the values on most property to somewhat the same levels through thick and thin. This, I think, presents perhaps the main reason why the Utah Power & Light Company, an illustration given in the briefs, actually was given a higher valuation during the period from 1930 to 1936 than it had in 1929. The prospective earning power is therefore a very important element. And I see no reason why the value that the utilities themselves place on items of tangible property may not be an element even though they are listed for rate making. In fact, even after the last word is spoken on the difference between value for rate-making and tax purposes, which last word will probably be just before the last lawyer and last court become extinct, the intelligent layman will still find difficulty in appreciating why a truck, for instance, should be valued at one figure for the ratepayer and at another figure for the taxpayer. The answer may lie in the esoterics of depreciation accounting.

I recognize, however, that utilities must be assessed as a unit—poles or trucks or power plants cannot be separately picked out and assessed except as an aid to arrive at a total unit assessment. But the Legislature may require the values on constituent tangible items, put in for rate making, to be accessible to the Tax Commission for its information. I

agree, however, that it cannot make the valuations of the Public Service Commission for rate making the absolute value for taxation purposes. For two reasons: One stated very well in the main opinion, that this would be putting in the Public Service Commission the duty of assessing the tangible property whereas the Constitution makes the Tax Commission the sole agent for that purpose; two, if it be contended that the Legislature required the findings of the Public Service Commission to be used as the value of those same tangibles for taxation purposes and that the Legislature is thereby only prescribing a formula, the answer is two-fold: One, that the legislative requirement that a body charged with the duty of assessing accept unqualifiedly a particular valuation is hardly a formula—the second body is not a valuing body but a mere copyist; two, the formula is too restricted to meet the requirements of due process. As before stated, any formula prescribed by the Legislature would have to be reasonably appropriate and bear some reasonable relation to the matter of determining money value. If it was so restricted as to exclude every element which in common practice, and by the common experience of mankind, is used to arrive at a judgment of money value or value in money, it would not be constitutional—not because the Legislature under article 13 would not have the power to prescribe a formula, but because the formula was of such a nature as to deny due process. The Legislature might require the Tax Commission to obtain the values found by the Public Service Commission and use them as a basis or factor for assessment where the Tax Commission was permitted to use the other principles above suggested for the ascertainment of money value and by a process of revision or modification from the figures obtained from the Public Service Commission arrive at a money value by the application of those principles, either higher or lower than the value found by the Public Service Commission for ratemaking purposes. That is quite a different thing than was done in the case at bar, where the figures found by the Public Service Com-

mission were made absolute on the Tax Commission. The Legislature attempted to compel the utility to make its own assessment for taxation, coerced in chapter 87 by the necessity of making it high enough in order to obtain a rate by which it may hope to obtain a fair return.

I have attempted in this opinion to set definite limits on what I consider to be the infirmities in the scheme contained in chapters 87 and 100, and to reconcile in a way differently than does the CHIEF JUSTICE the phrases in sections 3 and 11 of article 13 of the Constitution, but I fully concur in these general propositions laid down in that opinion: (1) That chapters 87 and 100 are one interlacing scheme and must be considered together as a plan for arriving at the valuation of utilities; (2) that the Legislature has no power to directly assess tangible property of any kind; (3) that the Tax Commission is the sole agency for assessing utilities; (4) that in the scheme laid down in chapters 87 and 100 the utility itself or the Public Service Commission really make the assessment. I furthermore think: (5) That the Constitution gives the Legislature power to prescribe a formula or method for finding money value of all tangible property in the state; and (6) that such formula when prescribed must direct or permit the inclusion of those elements generally taken into consideration by buyers who would translate the property into money value.

LARSON, Justice (dissenting).

I dissent. I think the statutes involved in this action have been misread, misconstrued, and misapplied. A reading of the statutes in what seems to me to be the fair and reasonable import of the language used disposes of the questions involved without the necessity of constitutional constructions which indicate and imply a departure from our well established political concept of a tri-partite government. I cannot conceive that the people of the State of Utah intended in 1930 to amend the constitution of the state to depart from time-honored principles of government, or to abrogate from

themselves and their elected and responsible representatives, into a nonresponsible, appointive commission, any of the legislative functions of the government. Since this is a dissenting opinion, any long essay or argument on the theory of constitutional interpretation and government could serve no useful purpose. But the matter being one of such great importance, involving such far-reaching consequences, and the rejection of some principles and the announcement of others, which may vitally influence the future of all legislation and perhaps thereby necessitate further constitutional changes if the ideal of American government, a tri-partite system, is to prevail, I deem it proper to indicate the matters wherein I must disagree with my associates.

As suggested by Chief Justice FOLLAND in the majority opinion, there are two primary questions involved in this proceeding: (1) Has the Legislature directed an assessment for taxation of tangible utility property upon a basis other than the value of such property in money as required by section 3 of article 13 of the State Constitution; and (2) Does the Constitution, section 11 of article 13, vest in the State Tax Commission the *sole* and *exclusive right* to fix the value for taxation purposes of the properties of utilities, and the *sole* and *exclusive right* to *prescribe* the rules, regulations, and principles which shall govern and control such assessments; and upon which they must be founded? The above questions are paraphrased somewhat from the language of the CHIEF JUSTICE, but present the same ideas. The answer to the questions may be found in the construction and meaning of chapter 87 and chapter 100 of Laws of Utah 1937. Chapter 87 has to do with the authority of the Public Service Commission over utilities, and provides that all public utilities doing business in the state, "whose rates [in the state] are based [solely] on the valuation [in money] of its properties or the amount of its investments [in such properties] [shall] declare through its authorized agent * * * the full value [in money] of all of the tangible and intangible properties * * * located within the state," sepa-

rately from and stripped of its intangible assets, values, or properties. Section 76-4-21X, as added by chapter 87. Be it noted that by express declaration of statute this applies only to those utilities whose rates, effective in the State, are fixed by the Public Service Commission or any federal commission, upon the basis solely of the valuation of its physical properties or the amount of its investment in such physical properties. Utilities whose rates are fixed upon any other basis, into whose evaluation for rate-making purposes the Commission takes other elements, whose rates are fixed even in part upon intangible elements and values such as its stocks and bonds, its debts, the service it is required to render to the public even at a loss in particular services or places, the effect of rates on the volume or traffic, or the promotion of the development and use and consumption of its service, protection of the quality of its service, the need of revenues to enable the utility to provide the same, conditions of competition, the denial of the right to get a higher rate by contract, and numerous other elements, often and generally do enter into the rate-making basis. Where such is the case, the utility does not come within the statute and is not required to file such report or valuation. The utility which seeks a rate fixed only upon the valuation of its physical properties or upon the amount of its investment in such physical properties cannot well complain upon being required to furnish such statement or valuation as a basis upon which its rates are to be fixed and determined. By section 76-4-21, as amended in 1937, c. 87, it is provided that such declared value shall be deemed the true value of property for all purposes of the Public Service Commission Act unless the same be changed by the Commission after a hearing had on proper notice. This prevents the setting up of excessive or extravagant values; or the claiming of rates based upon investment far in excess of the value of the property acquired. If this is, and I think it must be, the proper construction of the statute, perhaps none of the defendants and cross-complainants come within the scope of the act

and therefore are not required to file such return and statement. I assume that with such meaning of the statute made clear the Public Service Commission will not require such reports except from utilities whose rates are fixed solely upon the basis of value of its physical property or amount invested therein. As to such utilities therefore as come within its provisions, chapter 87 is a reasonable and proper requirement and is not subject to the objections as to its constitutionality. It makes no reference to chapter 100 or to taxation and stands alone. The fact that chapter 100 with reference to taxation provides for the Tax Commission's making use of some information obtained by the Service Commission may bear upon chapter 100 but cannot affect chapter 87. To say the Legislature would not have enacted chapter 87 as here construed without enacting chapter 100 is assuming a divine omniscience to which I make no pretensions.

We come to the consideration of the matters involved in the second question, supra, as to the extent of the power given by the Constitution to the State Tax Commission in the assessment of utility property. I am unable to concede that the people of the State intended in 1930 to strip themselves and the legislative arm of the state government of all power and authority to prescribe rules, regulations, and principles governing assessment of any kinds of property and vest the power in a nonresponsible appointive commission. Nor do I think that section 11 of article 13 of the Constitution merits any such construction. That section was adopted at the general election in 1930 as were also sections 2, 3, 4, and 7 of article 13. All were companion measures, set up and recommended by the Tax Revision Commission mentioned by the CHIEF JUSTICE in the prevailing opinion, and must be construed as a unified system, as parts of a unified and harmonized whole. To place upon section 11 the construction given it in the majority opinion disrupts and makes meaningless all the other sections enacted by the

people at the same time, and makes a medley out of the article.

Section 2 declares:

"All tangible property in the State, not exempt under the laws of the United States, or under this Constitution, shall be taxed in proportion to its value, to be ascertained as provided by law."

Section 3 reads:

"The Legislature shall provide by law a uniform and equal rate of assessment and taxation on all tangible property in the State, according to its value in money, and shall prescribe by law such regulations as shall secure a just valuation for taxation of such property, so that every person and corporation shall pay a tax in proportion to the value of his, her, or its tangible property. * * *"

Section 4 says:

"All metalliferous mines or mining claims, both placer and rock in place, shall be assessed as the Legislature shall provide. * * * All other mines or mining claims and other valuable mineral deposits, including lands containing coal or hydrocarbons and all machinery used in mining and all property or surface improvements upon or appurtenant to mines or mining claims, and the value of any surface use made of mining claims, or mining property for [other than mining purposes, shall be assessed as] other tangible property."

And section 11 provides:

"There shall be a State Tax Commission consisting of four members, not more than two of whom shall belong to the same political party. The members of the Commission shall be appointed by the Governor, by and with the consent of the Senate, for such terms of office as may be provided by law. The State Tax Commission shall administer and supervise the tax laws of the State. It shall assess mines and public utilities and adjust and equalize the valuation and assessment of property among the several counties."

It is thus provided that the method of ascertaining the value of *all tangible* property in the State, not exempt, shall be provided *by law*—that is, by the Legislature. Section 2. It then is provided that the *Legislature shall prescribe by*

*law such regulations* as shall secure a just valuation for taxation of *all tangible* property in the state, so that every person and corporation shall pay a tax in proportion to the value of his or its property. Section 3. Now section 4 declares that mines and mining property shall be assessed as the Legislature shall provide; and section 11, that the State Tax Commission shall assess mines. Clearly the argument of the prevailing opinion that the special or specific enactment shall take precedence over or control the general has no application as between section 3 and section 4, for each is specific, referring to the limited subject of assessment, one stating specifically that mines are to be assessed as provided by the Legislature, and the other, that they are to be assessed by the Tax Commission. You cannot say there is a conflict between two sections of the Constitution, adopted at the same time, and then assume to pick a winner which shall be given effect, and the other one be in effect declared unconstitutional. We must therefore so construe them as to harmonize them and render them both effective. The Legislature shall provide the means, the methods, and the mechanics by which mines and mining claims shall be assessed; it shall establish and declare the principles which shall govern such assessments; and the Tax Commission is charged with the duty of carrying into effect such principles according to the methods prescribed, in such a way as shall effectuate section 2, that it be taxed in proportion to its value, under such regulations as the Legislature may prescribe to secure a just valuation and pay a tax in proportion to its value. Be it noted that these provisions of the Constitution, adopted at the same time, and each of sections 2, 3, and 4, state that the Legislature shall prescribe the methods, means, regulations, and principles governing assessments, while section 11 does not specifically authorize the Tax Commission to do any such things. The obvious effect is that it was intended that the Legislature should proclaim all methods and principles and the Tax Commission "administer" the tax laws of the State generally, and as

necessary to "assess mines and public utilities and adjust and equalize the *valuation* and *assessment* of property among the several counties." I must therefore conclude that section 11 of article 13 is not a limitation on the power of the Legislature to prescribe and control the principles or methods governing assessments of utilities, but merely the creating of a constitutional body to administer and carry into effect such provisions of the laws of the State.

Now as to chapter 100, Laws of Utah 1937, it definitely requires the Tax Commission to accept as the true and actual value of utility property a value fixed by the Public Service Commission without the exercise of judgment by the assessing body as to values, and with no provision being made for an equalization hearing thereon by any proper body. Such chapter must therefore fail as null and void.